Todd M. HALBERT, Appellant,

v.

Sami YOUSIF and Sana Yousif, and Florence Tanners, Inc., Appellees.

Nos. 97–CV–75047, 97–CV–75048.

United States District Court, E.D. Michigan, Southern Division.

July 2, 1998.

Louis P. Rochkind, Detroit, MI, for Appellant.

John Hertzberg, Southfield, MI, for Appellees.

*ORDER*

JULIAN ABELE COOK, Jr., District Judge.

On this appeal from a decision of the Eastern District of Michigan Bankruptcy Court, the Appellant, Todd M. Halbert, claims that the court below erred in holding that he had repeatedly violated his fiduciary duties as the attorney for the Appellees, Sami Yousif, Sana Yousif and Florence Tanners, Inc., during his representation of their legal interests in their Chapter 11 bankruptcy proceedings. The Bankruptcy Court determined, *inter alia,* that (1) he had breached his legal and ethical duty to fully and accurately disclose his financial arrangements with the Appellees, and (2) his appointment to represent the Appellees in the bankruptcy proceedings was invalid because of his failure to publicly disclose those facts which rendered him financially interested in the bankruptcy estates. Because of these deficiencies, the Bankruptcy Court sanctioned Halbert by completely denying his fee applications, a decision that he also challenges.

For the reasons that have been stated below, the decision of the Bankruptcy Court

is affirmed in part, vacated in part, and remanded.

## I.

Appellees, Sami and Sana Yousif, are husband and wife. During the time period that is pertinent to this dispute, Sami Yousif was the sole shareholder and president of a retail store, Florence Tanners, Inc. (Tanners), also an Appellee in this cause of action. Tanners sells leather and fur coats to the general public. Halbert is an attorney who represented Tanners for approximately three years before it filed for protection under Chapter 11 of the Bankruptcy Code on December 9, 1994. Tanners' bankruptcy petition was filed because (1) it had entered into several unprofitable shopping leases, and (2) Sami Yousif feared that the bank, which had handled his business account, would not renew its annual line of credit. Because the Yousifs were the guarantors of a certain bank debt and a number of shopping leases, they also filed a bankruptcy petition under Chapter 11.[1]

A reorganization plan was confirmed on September 18, 1995 for each Chapter 11 case. The Tanners's reorganization resulted in a discharge of 75% of its unsecured debts as well as a release of all of its guaranteed debts, amounting to an extinguishment of $2,443,000. The Yousifs' reorganization brought about the discharge of $686,000 in debts, which represented a discharge of 70% of their unsecured debts as well as a release of approximately $413,000 of their guaranteed debt.

Although the Appellees acknowledge that Halbert obtained good results for them in the Bankruptcy Court, they have challenged the fiduciary propriety of his conduct and the amount of fees that he has requested for his services.[2] Halbert filed a motion for a summary judgment on his fee applications, to which the Appellees responded in opposition along with a counter motion for a summary judgment.

At the completion of the oral argument, the Bankruptcy Court concluded that Halbert had violated his fiduciary duties to the Appellees. *In re Florence Tanners, Inc.*, 209 B.R. 439 (Bankr.E.D.Mich.1997). According to the Bankruptcy Court, he had repeatedly failed to comply with the disclosure requirements of 11 U.S.C. § 329(a) and corresponding Fed. R. Bankr.P.2016(b). *Id.* at 441–44.

> These provisions require an attorney to disclose all fee payments and agreements made after one year before the bankruptcy filing, for services in contemplation of, or in connection with, the bankruptcy filings. Such disclosures must be made within 15 days of the filing, or within 15 days of a payment or agreement not previously disclosed. Each payment and each agreement must be separately disclosed.

*Id.* at 442 (citation omitted).

Specifically, the Bankruptcy Court determined that Halbert, in executing the form upon which the challenged financial disclosure was made, (1) gave the "impression" that (a) he had only charged his clients a flat $25,000 fee, whereas his legal services were being compensated on an hourly basis, and (b) he had been paid another $26,600 fee although this amount was actually a retainer, (2) had failed to disclose his fee agreement with the Appellees for pre-petition services in contemplation of their bankruptcy petitions,[3] (3) gave the misimpression that the $26,600 retainer was the only payment that he had received from the Appellees for his legal services during the year immediately preceding the filing of the bankruptcy petition, and (4) failed to disclose the post-petition payments that he had received during the bankruptcy proceedings, which violated his supplemental disclosure obligation even if the confirmation plan made those fees not subject to prior Court review and approval. *Id.* at 442–44.

---

1. Halbert was the attorney of record for the three Appellees during all of the bankruptcy proceedings that are pertinent to this controversy.

2. In the Yousifs' cases, Halbert requested $26,242.32 in fees. In the Tanners case, he sought $138,733.68.

3. The Bankruptcy Court expressed the view that Halbert's obligation to disclose his agreement with the Appellees existed regardless of his waiver of the pre-petition bankruptcy fees.

The Bankruptcy Court also held that Halbert had violated the disclosure requirements of Fed. R. Bankr.P.2014(a) in connection with his appointment to represent the Appellees when he failed to disclose the pre-petition payments that had been made to him by Tanners, which occurred in the form of merchandise transfers. *Id.* at 444–49. The Court concluded that these transfers were potentially preferential, which could have put Halbert in a position "materially adverse to the interests of the estate" under 11 U.S.C. § 101(14)(E), and that he should have disclosed them in his affidavit of disinterestedness.[4] *Id.* at 446. It wrote: "[a]s a matter of law, the Court concludes that debtor's counsel must disclose in the attorney's affidavit of disinterestedness each payment received from the debtor within 90 days before the bankruptcy filing." *Id.* at 448.

The Bankruptcy Court also found that Halbert had obtained fees without official approval, in violation of 11 U.S.C. § 330, when he removed funds from the retainer that had been paid to him by Tanners. *Id.* at 449–50. Additionally, it opined that Halbert had violated Article 11.2 of the confirmed plan when he obtained other payments from the Appellees based on conversations with Yousif because Article 11.2 provided that Halbert should submit a written statement for services performed. *Id.* at 450.

Thereafter, the Bankruptcy Court issued a second opinion in which it denied Halbert's motions for summary judgment, granted the Yousifs' and Tanners' summary judgment motions, and denied in full Halbert's fee applications.[5] *In re Florence Tanners, Inc.,* 213 B.R. 129 (Bankr.E.D.Mich.1997).

The disrespect that Halbert has demonstrated for the disclosure requirements of the law, for this Court's orders, and for

proper fee processes is extraordinary and unprecedented in the Court's experience. In every bankruptcy case, debtor's counsel must understand that matters of disclosure and payment of fees affect the administration of justice in bankruptcy cases in fundamental ways, and therefore must be addressed with the greatest seriousness, caution, and deliberation. The only proper response to the concerns raised here is denial of Halbert's fees.

*Id.* at 132. The opinion also noted that Halbert's failure to disclose potentially preferential pre-petition transfers of merchandise was in itself a sufficient ground to deny fees. *Id.* at 132. Finally, inasmuch as the receipt of the merchandise from Tanners created a conflict of interest for Halbert, the Court found that a denial of fees was a mandatory sanction because only disinterested attorneys may be appointed to serve a bankruptcy estate. *Id.* at 133. Consequently it denied both of his fee applications.

The appeals by Halbert of the Yousifs' and Tanners' cases have been consolidated by this Court for the purpose of this proceeding. Since the decisions by the Bankruptcy Court were rendered on competing summary judgment motions, a de novo standard of review will be utilized. *See Northeast Ohio Coalition for the Homeless v. City of Cleveland,* 105 F.3d 1107, 1109 (6th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997). The familiar summary judgment standards of Fed.R.Civ.P. 56(c), which are applicable to this contested bankruptcy proceeding pursuant to Fed. R. Bankr.P. 7056, will be adopted by this Court in its review of the issues that have been raised on appeal.

4. Halbert had raised five alternate defenses to the claim that these transfers were preferential, one of which was that Tanners was not insolvent at the time of the transfers. The Bankruptcy Court was troubled by Halbert's assertion because this defense ostensibly jeopardized the settlements, which totaled the sum of $134,568, that Tanners had obtained in eight preference adversary proceedings. Halbert contests the validity of this reasoning and asserts that (1) no impropriety was committed when he set forth his belief that Tanners was solvent in the ninety days pre-

petition, and (2) no jeopardy can inure to his corporate client as a result of this allegation.

5. In their summary judgment motion, the Appellees asked for the entry of an order of disgorgement. (R. 13 & 14, at 12.) Although the Bankruptcy Court granted their motion, it appears to have limited its sanction to a denial of the attorney fees that had been requested by Halbert. (R. 21); *In re Florence Tanners,* 213 B.R. at 130, 134.

## II.

The Bankruptcy Court correctly concluded that (1) Halbert unlawfully withdrew funds from a $26,600 retainer fee that he had obtained from Tanners, and (2) prior to the confirmation of the Tanners bankruptcy plan, he withdrew funds from it on four occasions until it was fully depleted without filing supplemental disclosures or seeking Court approval. *In re Florence Tanners*, 209 B.R. at 443, 444, 449. The Bankruptcy Court also properly held that his conduct violated Rule 2016(b) and 11 U.S.C. § 330, which governs the terms under which professionals appointed pursuant to § 327(a) may be compensated.[6] *Id.* at 444, 449.

Halbert does not contest the factual findings of the Bankruptcy Court on this issue, but argues that the sanction of denying all of the fees that he requested in the Yousif and Tanners bankruptcies constitutes an abuse of discretion. Halbert's argument lacks merit because he incorrectly limits his misconduct to his misappropriation of the Tanners' retainer fee. Upon review of the record, this Court concludes that the Bankruptcy Court correctly determined that Halbert violated several other fiduciary obligations that had been imposed upon him by bankruptcy law. Based on these acts of misconduct, the Bankruptcy Court assessed the totality of Halbert's violations and concluded that "[t]he only proper response" to those deficiencies was to deny his fee applications. *See In re Florence Tanners*, 213 B.R. at 130–32; *In re Florence Tanners*, 209 B.R. at 449–50. This is unquestionably a proper method for imposing sanctions. *See In the Matter of Futuronics Corp.*, 655 F.2d 463, 471 (2d Cir.1981); *In the Matter of Arlan's Dep't Stores, Inc.*, 615 F.2d 925, 938, 943 (2d Cir.1979).

## III.

The Bankruptcy Court found that Halbert violated Fed. R. Bankr.P.2014(a) by failing to disclose that he had received merchandise transfers within ninety days before the Tanners bankruptcy filing, which were potentially preferential. As a result, Halbert was disqualified from employment as the Appellees' attorney under 11 U.S.C. § 327(a), which allows for the appointment of only disinterested professionals. Halbert, in maintaining that he fully complied with the disclosure requirements of Rule 2014(a), challenges the accuracy of this conclusion with regard to (1) the amount of merchandise transfers, and (2) the application of certain transfers to particular time entries in such a way as to create potentially preferential transfers. However, this challenged ruling is amply supported by evidence that Halbert received valuable property within a period of ninety days of the Yousif and Tanners bankruptcy filings.

In an attempt to maximize the size of the bankruptcy estate for the benefit of creditors, the Bankruptcy Code contains special provisions concerning the pre-petition transfer of a debtor's property. For example, the bankruptcy trustee may avoid any property transfer by a debtor that occurs within the ninety days immediately preceding the bankruptcy filing, provided that certain conditions are satisfied and no defenses validate the transfer. 11 U.S.C. §§ 547(b), (c). Such transfers are known as "preferences." [7]

During the course of Halbert's representation of Tanners prior to the filing of the Yousif and Tanners petitions for bankruptcy, Halbert says that he "reluctantly agreed" to

---

**6.** Halbert's four pre-confirmation withdrawals from the retainer could be characterized as attempts to obtain interim payments for his bankruptcy services, which are governed by 11 U.S.C. § 331. By not following the prescribed procedure for obtaining interim payments, Halbert appears to have violated the statute. Moreover, under § 331 an award of interim compensation can only be granted in conformance with the terms of § 330. 3 Collier's on Bankruptcy ¶ 331.01[4]. Section 330 provides that the requested compensation may be obtained by a court order only after notice and a hearing, and consideration of certain guidelines by the court.

By ignoring these procedures, it appears that Halbert violated § 330 as well. In any case, Halbert clearly violated at least one of these statutes, if not both. Consequently, the conclusion of the Bankruptcy Court on this issue must be affirmed even if it relied on the wrong ground or gave the wrong reason. *Olympic Fastening Sys., Inc. v. Textron, Inc.*, 504 F.2d 609 (6th Cir.1974); *Piatt v. Gray*, 321 F.2d 79 (6th Cir. 1963).

**7.** The Appellees' ninety-day preference window began on September 9, 1994.

accept merchandise transfers from Tanners, which insisted on paying its attorney fee obligation by this method. According to Halbert, he entered into a corresponding fee agreement with Tanners more than a year before its bankruptcy filing, which provided that he would accept merchandise transfers in payment for "accrued and future professional fees," to be valued at 40% of Tanners' "retail sales prices." [8] Halbert acknowledges that the following merchandise transfers occurred within the Appellees' ninety-day preference period.

(1) September 17, 1994: $250 retail price, credited at $100.

(2) October 1, 1994: $1,000 retail price, credited at $400.

(3) November 19, 1994: $5,943 retail price,[9] credited at $2,377.[10]

The Bankruptcy Court erred in finding that the merchandise, which was transferred during this period, had a value of $17,655.[11] *See In re Florence Tanners*, 209 B.R. at 446. Nevertheless, all parties to the case at bar agree that this merchandise had a retail value of at least $7,000.

■ The Bankruptcy Court correctly determined that, as a result of receiving transfers of value from Tanners within the ninety-day preference period, Halbert became ineligible to serve as its attorney, at least in the absence of curative measures which did not occur here. The Bankruptcy Code authorizes the employment only of professionals who (1) do not hold an interest adverse to, or (2) are disinterested in, the bankruptcy estate. 11 U.S.C. § 327(a);[12] *see In re Middleton Arms, L.P.*, 934 F.2d 723, 725 (6th Cir.1991); *In re Eagle–Picher Indus., Inc.*, 999 F.2d 969, 971–72 (6th Cir. 1993). The procedures for obtaining an appointment as a debtor's attorney under § 327(a) are found in Fed. R. Bankr.P. 2014(a). This Rule requires an attorney to provide an application and accompanying verified statement that sets forth all of the attorney's "connections" with the debtor.[13]

**8.** R. 12, Ex. 2.

**9.** The Bankruptcy Court found that this particular transfer was for merchandise with a retail value of $5,895. *In re Florence Tanners*, 209 B.R. at 443. This finding is incorrect. The Bankruptcy Court derived this figure from an exhibit that had been drafted by Halbert, which lists the retail value as $5,895. *Id.;* (R. 12, Ex. 3). However, in Halbert's brief (to which this exhibit is attached), he states that the amount is $5,943, which is substantially identical to the $5,942.96 shown in the invoice from which he derives this figure. (R. 12 at 5; R. 7, Ex. 2.) Thus, $5,943 is the true retail price.

**10.** (R. 12 at 5; R. 7, Ex. 2.) The correct credit value to attribute to the merchandise is confused by a dispute regarding the meaning of the term "retail sales price" in the fee agreement between Halbert and Tanners. As a marketing device, Tanners listed a higher and lower price on the sales tags of its coats. Tanners alleged that the higher price should have been used to calculate Halbert's 40% credit discount. (*See* R. 13 at 2, Ex. 1 ¶ 3.) Halbert asserts that he properly used the lower price on the basis of the plain language within their agreement, and credibly explains the implausibility of Tanners' position. (R. 15 at 18–19, Ex. B.)

**11.** The Bankruptcy Court derived this figure by totaling the retail value of merchandise that Halbert had received. *See In re Florence Tanners*, 209 B.R. at 443. However, this calculation improperly included (1) a transfer from December 29, 1993, and (2) a transfer with a retail value of $400 which was of an unknown date. The former should have been excluded from the computation because it occurred prior to Tanners' ninety-day preference period, and the latter should have been excluded on the basis of drawing all inferences in favor of Halbert on the Appellees' motion for a summary judgment.

**12.** Section 327(a) (emphasis added) provides:

[e]xcept as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, *that do not hold or represent an interest adverse to the estate, and that are disinterested persons,* to represent or assist the trustee in carrying out the trustee's duties under this title.

In Chapter 11 proceedings a debtor-in-possession generally has all the rights of a trustee. 11 U.S.C. § 1107(a). Thus, provisions of the Bankruptcy Code, such as § 327(a) which facially apply only to the bankruptcy "trustee," are nevertheless applicable to Tanners because it was a debtor-in-possession during its Chapter 11 reorganization. *See In re Federated Dep't Stores, Inc.*, 44 F.3d 1310, 1313 (6th Cir.1995); 3 Collier on Bankruptcy ¶ 327.07 (15th ed.1997).

**13.** Fed. R. Bankr.P.2014(a) (emphasis added) states:

[a]n order approving the employment of attorneys, accountants, appraisers, auctioneers,

Of particular concern under this disclosure duty has to be any "interest materially adverse to the interest of the estate," which can disqualify a professional from employment. *See* 11 U.S.C. §§ 101(14)(E) & 327(a); *In re Eagle–Picher*, 999 F.2d at 971.

It was well-settled by the time that Halbert filed the instant petitions that an individual who possesses an interest which is *potentially* adverse to the estate could be disqualified from employment under § 327(a). *See Rome v. Braunstein*, 19 F.3d 54, 57–58 (1st Cir.1994). Moreover, Halbert, as an attorney, was at least constructively aware of the policy reasons for the strict application of a protective mechanism against a potential conflict of interest.

> "It is the duty of counsel for the debtor in possession to survey the landscape in search of property of the estate, defenses to claims, preferential transfers, fraudulent conveyances and other causes of action that may yield a recovery to the estate. The jaundiced eye and scowling mien that counsel for the debtor is required to cast upon everyone in sight will likely not fall upon the party with whom he has a potential conflict. . . ."

agents, or other professionals pursuant to § 327 . . . of the Code shall be made only on application of the trustee or committee. The application shall be filed and . . . a copy of the application shall be transmitted by the applicant to the United States trustee. *The application shall state* the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, *to the best of the applicant's knowledge, all of the person's connections with the debtor*, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. *The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor*, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

**14.** The *McKinney* decision has been the subject of some disagreement, but not on the ground at issue here. *See In re Atkins*, 69 F.3d 970, 975 n. 5 (9th Cir.1995); *In re Downtown Inv. Club III*, 89 B.R. 59, 64–65 (9th Cir. BAP 1988); *In re Lotus Properties L.P.*, 200 B.R. 388, 392–93

*In re Interwest Business Equip., Inc.*, 23 F.3d 311, 316 (10th Cir.1994) (quoting *In re McKinney Ranch Assoc.*, 62 B.R. 249, 254, 255 (Bankr.C.D.Cal.1986) [14]).

Despite these well-established bankruptcy principles, Halbert objects to the decision by the Bankruptcy Court that "[a]s a matter of law . . . debtor's counsel must disclose in the attorney's affidavit of disinterestedness each payment received from the debtor within 90 days before the bankruptcy filing," *In re Florence Tanners*, 209 B.R. at 448, on the grounds that (1) this holding represents a new statement of law which is unsupported by the Bankruptcy Code or Rules, or (2) constitutes an impermissible act of rule-making. Halbert correctly argues that none of the three cases, which were cited by the Bankruptcy Court, explicitly reached the same result. Nevertheless, his argument must be rejected for several reasons.[15]

First, the concept of disinterestedness in § 327(a) unquestionably covers not only actual, but also potential, conflicts of interest, and includes the avoidance of an appearance of a conflict of interest. *See, e.g.*,

(Bankr.C.D.Cal.1996); *In re Palumbo Family Ltd. Partnership*, 182 B.R. 447, 456 (Bankr.E.D.Va. 1995); *In re Laguna Hills Financial Assocs.*, 93 B.R. 224, 225–26 (Bankr.C.D.Cal.1988).

**15.** When faced with a similar factual situation, the Second Circuit Court of Appeals (Second Circuit) rebuffed an attorney's argument which was substantively comparable to the arguments that Halbert has submitted to this Court. At the trial level, a law firm had been denied its fee applications and ordered to disgorge payments on account of violating its duty to disclose "all of [its] connections with the . . . debtor," including a failure to initially disclose a retainer paid to it. *In the Matter of Arlan's Dep't Stores*, 615 F.2d at 929, 931 & n. 2, 935 (interpreting General Order in Bankruptcy 44, which was superseded by Bankruptcy Rule 215, the predecessor to Fed. R. Bankr.P.2014(a)). The law firm argued that it had violated no duty because the applicable authority contained "no explicit language . . . which require[d] the disclosure of an attorney's fee arrangement with the debtor in the petition for appointment." *Id.* at 935. Despite agreeing with this assertion, the Second Circuit wrote that the authority "does require disclosure of all connections with the debtor, and the issue here is whether the . . . retainer is a connection with the debtor." *Id.*

*Rome,* 19 F.3d at 57–58; *In re 419 Co.,* 133 B.R. 867, 869 (Bankr.N.D.Ohio 1991). Second, the merchandise transfers that Halbert received certainly implicate the concept of "disinterestedness," as it is used in bankruptcy law. Disinterestedness has been defined as possessing or asserting any economic interest that would tend to lessen the value of a bankruptcy estate or create an actual or potential dispute in which the estate is a rival claimant. *In re 419 Co.,* 133 B.R. at 869. Obviously the merchandise received by Halbert during the ninety days pre-petition satisfies this definition since, in the absence of its transfer, it would have been a part of the bankruptcy estate. Third, this constructive knowledge should have caused Halbert to disclose the transfers pursuant to Fed. R. Bankr.P.2014(a) because they created a pre-petition "connection" with Tanners that, under bankruptcy law, he unequivocally had a duty to timely, accurately, and completely disclose in his retention papers. *See, e.g., In re Decor Corp.,* 171 B.R. 277, 282 (Bankr. S.D.Ohio 1994); *In re American Thrift & Loan Assoc.,* 137 B.R. 381, 388 (Bankr. S.D.Cal.1992). Sufficient information must be disclosed so that the bankruptcy court may preserve the integrity of the judicial process, guard against potential conflicts, address actual conflicts, and ensure that the debtor's counsel is primarily concerned with the estate's best interest. *In re Decor Corp.,* 171 B.R. at 282. Therefore, the holding by the Bankruptcy Court, to which Halbert objects, is perfectly consistent with the language and goals of the Bankruptcy Code and Rules.

■■■ Halbert argues that he did not violate any disclosure duty because the possibility that some of the merchandise transfers might be preferential never even occurred to him.[16] That, however, is not the issue. The standard is whether that issue *should* have occurred to him since the language of Rule 2014(a) requires mandatory disclosure, imposes upon those professionals who are appointed under § 327(a) a duty to fully and completely disclose any and all connections with debtors, and precludes them from exercising any discretion in deciding which connections merit disclosure. Significantly, negligence regarding disclosure is no excuse. *See Rome,* 19 F.3d at 59; *In re National Liquidators, Inc.,* 182 B.R. 186, 196 (S.D.Ohio 1995);[17] *In re EWC, Inc.,* 138 B.R. 276, 280, 281 (Bankr.W.D.Okla.1992). Therefore, Halbert's argument that he did not intend to purposefully hide the transfers from the Bankruptcy Court is irrelevant to the issue of whether he violated his disclosure duty.[18]

Thus, it is no defense for Halbert to argue that it did not occur to him to perform a preferential transfer analysis because the merchandise transfers he received were so unlike preferential transfers, as he understood them. The precedents cited clearly establish that, to preserve its role and the integrity of the bankruptcy process, full disclosure of all connections with a debtor which existed within the ninety day period immediately prior to the filing of the bankruptcy petition must be disclosed to the Bankruptcy Court. *See also In re Decor,* 171 B.R. at 282, 283, 284 ("the receipt of funds from a prospective debtor on the heels of the bankruptcy filing ... creates an unfavorable appearance and calls into question the integrity of the bankruptcy process" and "should have been set forth initially").

Moreover, the merchandise transfers that Halbert received are not exempt from this disclosure duty because they lacked "badges of impropriety" which he considers to be controlling,[19] such as that their value was not sufficiently high as to be indicative of a preferential transfer. The only determinative issue with regard to a *potentially* preferential transfer is whether an interest in the

---

16. Halbert Combined Br. at 39–41.

17. Although *In re National Liquidators* discusses disclosure duties in the context of 11 U.S.C. § 1103, which applies to creditor committees, the provisions in Fed. R. Bankr.P.2014(a) from which that court derives its holding are equally applicable to § 327(a).

18. This argument is more pertinent to the issue of sanctions and is addressed more fully in that portion of this Order. *See infra* Part V.

19. Halbert Combined Br. at 39–41.

property of a debtor is transferred within the ninety-day period preceding the bankruptcy filing. *See* 11 U.S.C. § 547(b); *In the Matter of Futuronics*, 655 F.2d at 469; *In re American Thrift*, 137 B.R. at 389–90. Indeed, ten months before Halbert filed Tanners' bankruptcy petition, a court held that "receiving payment within ninety (90) days prior to the filing ... may well constitute preferential payments." *In re Decor Corp.*, 171 B.R. at 283. Consequently, Halbert should have known that an issue existed regarding whether his receipt of merchandise transfers during the ninety-day preference period were at least potentially preferential, which, in turn, should have prompted him to make a prompt disclosure. "Attorneys cannot pick and choose which connections to disclose." *In re National Liquidators*, 182 B.R. at 196.

■ Halbert also complains that the Bankruptcy Court incorrectly evaluated his defenses on the issue of whether the merchandise transfers were actually preferential. *In re Florence Tanners*, 209 B.R. at 446–48. This protest is unavailing. Such defenses go to the merits and should have been addressed at an earlier time when Halbert was seeking the appointment as Tanners' attorney. "Professional retention presents a multitude of critical factors and concerns *that necessarily must be addressed early in chapter 11 bankruptcy cases.*" *In re Decor*, 171 B.R. at 282 (emphasis added). This certainly is the case where a debtor's attorney has received potentially preferential transfers. Under such a circumstance, his (or her) nondisclosure could lead to extensive disruption in the bankruptcy process if it is challenged by a creditor, at which point he (or she) would have an inappropriate vested interest in the litigation arising from a desire not to disgorge the transfer.[20] *See In re Brennan*, 187 B.R. 135, 154 (Bankr.D.N.J.1995). Moreover, whether the transfers were actually preferential is properly the subject of an appropriately timed adversary proceeding, and should not be considered in the context of a fee application, where the issue is disclosure. *See In re American Thrift*, 137 B.R. at 387. Once that point is reached, the concern is whether the integrity of the bankruptcy process has been impugned by the *appearance* of impropriety arising from a debtor having been represented by an attorney who received a potentially preferential transfer. *See Rome*, 19 F.3d at 60 ("section 327(a) is designed to limit even appearances of impropriety").

To the extent that Halbert relies upon arguments that are premised on 11 U.S.C. § 329 and Fed. R. Bankr.P.2016(b),[21] which require the disclosure of payments received within one year before the bankruptcy filing for legal services in connection with the bankruptcy, they are rejected as inapplicable. These provisions played no part in the ninety day disclosure requirement that was established by the Bankruptcy Court. *In re Florence Tanners*, 209 B.R. at 446 n. 9.

Thus, the Bankruptcy Court properly found that Halbert had failed to disclose his receipt of potentially preferential transfers from Tanners, in violation of his duties under bankruptcy law. Thereafter, the Bankruptcy Court opined that it would not have appointed Halbert to serve as Tanners' attorney because he would have failed the disinterestedness requirement in § 327(a). *In re Florence Tanners*, 213 B.R. at 133. As a result,

---

**20.** Although not directly on point because it is neither premised on § 327(a) nor Rule 2014(a), the following discussion is nevertheless instructive:

[p]roper disclosure and evaluation of fee arrangements are required by 11 U.S.C. § 329 as necessary in the early stages of the case not only to avoid remedial adjustment of fees in later stages of the case but also to prevent the escalation of a potential conflict into an actual one. If allowed to percolate without proper disclosure, a conflict may mature and either disrupt the case to the detriment of the debtor, creditors or the estate or simmer below the horizons of view by the Court or creditors, thereby accomplishing real damage unperceived until incurable, except by disgorgement or disallowance of fees. Other "unattractive options" may be necessary, including appointment of a trustee with its associated expense, removal of counsel with its implications on the ability to reorganize, and continuation of the case in spite of the conflict with its attendant risks. Such a result would affect not only the debtor's attorneys but also the estate and its creditors.

*In re Automend, Inc.*, 85 B.R. 173, 178 (Bankr. N.D.Ga.1988).

**21.** Halbert Combined Br. at 38–39.

the Bankruptcy Court declared that Halbert's appointment under § 327(a) was invalid and his application for fees had to be rejected because 11 U.S.C. § 330(a) allows compensation to be awarded only to validly appointed professionals. *Id.; In re Federated Dep't Stores, Inc.,* 44 F.3d 1310, 1318–20 (6th Cir.1995).

For several reasons, this Court does not find any merit in Halbert's contention that the Bankruptcy Court, in rejecting his fee application, established new law which should be applied only prospectively so as not to apply to him.

First, this argument has previously been rejected under reasonably similar circumstances. *See In the Matter of Arlan's Dep't Stores,* 615 F.2d at 943–44. Second, this Court rejects the contention that the Bankruptcy Court reached a novel result. Halbert had constructive knowledge that he should have disclosed the potentially preferential merchandise transfers. He should have had constructive knowledge that any application for fees could be denied if his appointment under § 327(a) was invalid.

In 1991, three and a half years before Halbert initiated the instant bankruptcies, the Sixth Circuit Court of Appeals (Sixth Circuit) held that § 327(a) "clearly states . . . that the court cannot approve the employment of a person who is not disinterested, even if the person does not have an adverse interest." *In re Middleton Arms,* 934 F.2d at 725. In addition, it opined that the equitable powers of a bankruptcy court cannot be used to contravene this " 'unambiguous statutory language.' " *Id.* (quoting *In re C–L Cartage Co.,* 899 F.2d 1490, 1494 (6th Cir. 1990)).

This holding can only be taken to mean that disinterested professionals are disqualified by § 327(a) from representing debtors in bankruptcy. The Sixth Circuit later confirmed this reading in a case which also held that "a valid appointment under § 327(a) is a condition precedent to the decision to grant or deny compensation under § 330(a) or § 328(c)." *In re Federated,* 44 F.3d at 1320. *In re Federated* was decided on January 17, 1995, just over one month after Halbert filed the bankruptcy petitions at issue. Thus, at best Halbert might have a claim for his first month of work despite his interest in the estate.[22]

Halbert asserts that he cannot be attributed with constructive knowledge that his fees could be denied because the law on disinterestedness has been subject to conflicting authority. It is true that some courts have refused to follow a strict disqualification rule, preferring to engage in a case-by-case evaluation, *In re Decor,* 171 B.R. at 282 (courts "generally refuse to follow" per se disqualification rule); *see In re Martin,* 817 F.2d 175, 180 (1st Cir.1987), while others have used a per se disqualification approach, *see In re Gray,* 64 B.R. 505, 508 (Bankr. E.D.Mich.1986). However, Halbert's argument suffers from two deficiencies.

First, his position ignores the import of *In re Middleton Arms* and *In re Eagle–Picher,* which led to the holding by the Sixth Circuit in *In re Federated.* Despite these decisions, Halbert never made protective supplemental disclosures to the Bankruptcy Court, and his receipt of property from Tanners within the ninety days preceding the filing of its petition was first brought to the attention of the Bankruptcy Court on December 26, 1996, over two years after he should have disclosed that information, and then only in the Appellees' objections to his fee applications.

■ Second, the existence of conflicting authority clearly suggests that Halbert should have adopted a more conservative approach and erred on the side of disclosure. *See Rome,* 19 F.3d at 59; *In re Gray,* 64 B.R.

---

22. Arguably, this limited claim for compensation would then be subject to rejection by the Bankruptcy Court on account of his other disclosure violations. Moreover, the Court notes that any claim by Halbert that he is entitled to compensation for the first month is quite open to debate, inasmuch as the Sixth Circuit has indicated that the 1991 decision date of *In re Middleton Arms* establishes the notice threshold up to which fees can be awarded to interested professionals. *In re Federated,* 44 F.3d at 1320 (granting partial compensation to professional entity that was interested in estate for fees incurred up to the date of *In re Middleton Arms* because "[a]fter that date . . . [parties] are charged with the knowledge that [they] proceed at risk and beyond the equitable authority of the bankruptcy court to effect further compensation").

at 508. An attorney, who adopts a different strategy and fails to spontaneously, timely, and completely disclose actual or potential conflicts of interest, proceeds at his own risk. *Rome*, 19 F.3d at 59; *In re EWC*, 138 B.R. at 281 ("No matter how old the connection, no matter how trivial it appears, the professional seeking employment must disclose it. The court and interested parties are then informed and the professional does not run the risk of serving the estate pro bono."); *In re Saturley*, 131 B.R. 509, 517 (Bankr.D.Me. 1991); *In re Gray*, 64 B.R. at 508; *In re Whitman*, 51 B.R. 502, 507 (Bankr.D.Mass. 1985). This rule applies even when the failure to disclose was innocent. *In re Glenn Elec. Sales Corp.*, 99 B.R. 596, 600 (D.N.J. 1988); *In re Michigan Gen. Corp.*, 78 B.R. 479, 482 (Bankr.N.D.Tex.1987); *In re Coastal Equities, Inc.*, 39 B.R. 304, 308 (Bankr. S.D.Cal.1984). Thus, Halbert must accept the consequences of the manner in which he chose to proceed.

 Halbert implies that his actions were justified because, in addition to the law on this subject being unclear, *In re Federated* puts professionals in the difficult position of balancing the desire to do business with the risk of not being compensated. However, the fiduciary duties that were imposed upon him under bankruptcy law do not exist to foster his economic vitality but to preserve the integrity of the bankruptcy process and protect vulnerable debtors from overreaching by the professionals from whom they seek assistance. *See In re EWC*, 138 B.R. at 279; *see also In re Yellow Cab Coop. Ass'n*, 185 B.R. 844, 851 (Bankr.D.Colo.1995) (discussing § 329 and Rule 2017). Therefore, because the appearance of impropriety is to be avoided to the extent reasonably practicable, any doubt as to whether certain facts give rise to a disqualifying conflict of interest should be resolved in favor of disqualification. *Rome*, 19 F.3d at 54.

Finally, Halbert submits that a more cautious approach to a finding of disinterestedness than that which was advanced by the Bankruptcy Court would be appropriate, especially in view of the mandatory denial of earned fees in *In re Federated*. In support of this proposition, he identifies the following language:

> [i]t simply exceeds rational bounds to rule that an adverse interest exists merely because a committee member's or a creditor's transactions with the debtor will be investigated, or because a remote, speculative, hypothetical possibility exists that, in the future, the estate or the Committee may dispute the creditor's claim or bring a cause of action against the creditor.

*In re National Liquidators*, 182 B.R. at 192. This citation is not helpful to Halbert, in that it is premised on a peculiar feature of 11 U.S.C. § 1103(b), which addresses an attorney's employment to represent a bankruptcy committee. Congress liberalized that statute by amending it to allow for an attorney's dual representation of the committee and a creditor. *In re National Liquidators*, 182 B.R. at 191–92. Based on this, the Court concluded that Congress implicitly determined that the inherent conflict of interest raised by such dual representation was by itself insufficient, and too theoretical, to warrant a finding of disinterestedness. *Id.* at 192. This aspect of *In re National Liquidators* distinguishes it from the case at bar where no such indication exists that the disinterestedness requirement in § 327(a) should be permissively enforced.

### IV.

Attorneys have a duty (1) to file with the Bankruptcy Court a statement of compensation paid, or agreed to be paid, (2) if such payment or agreement was made in the year preceding the filing of the petition, (3) for services rendered or to be rendered by the attorney in contemplation of or in connection with the bankruptcy, and (4) which discloses the source of such compensation. 11 U.S.C. § 329(a). Corresponding Rule 2016(b) requires that the statement be filed within fifteen days after the order for relief or of a payment or agreement not previously disclosed. Fed. R. Bankr.P.2016(b). Halbert had attempted to comply with this rule by filing a commonly used, although unofficial, court form that contained the following language:

> [t]he undersigned, pursuant to Rule 2016(b), Bankruptcy Rules, states that:

(1) The undersigned, is the attorney for the debtor(s) in this case.

(2) The compensation paid or agreed to be paid by the debtor(s) in this case.

(a) for legal services rendered or to be rendered in contemplation of and in connection with this case $25,000.00

(b) prior to filing this statement, debtor(s) have paid $26,600.00

---

*See In re Florence Tanners,* 209 B.R. at 442.

The Bankruptcy Court found that these disclosures violated § 329(a) and Rule 2016(b) in numerous ways. *In re Florence Tanners,* 209 B.R. at 441–44. First, it concluded that he misrepresented his fee agreement with Tanners by implying that he would receive only a $25,000 flat fee for that bankruptcy case, whereas the record showed that he was being paid an hourly fee, which he also failed to disclose. Second, it held that Halbert made a material misrepresentation that he had received a $26,600 fee in Tanners, although that amount was actually a retainer. Third, it ruled that Halbert had failed to disclose an hourly fee agreement regarding services rendered in contemplation of bankruptcy since April 21, 1994, thereby violating his disclosure duties regardless of his waiver of pre-petition fees. Fourth, it declared that Halbert misrepresented that the $26,600 fee was the only payment that he received from the Appellees in the year preceding the bankruptcy petition filing. On this issue, it concluded that this disclosure did not include his receipt of the merchandise transfers which were partially made in payment for services rendered in contemplation of bankruptcy. Fifth, it found that Halbert had failed to file supplemental disclosures regarding his receipt of ten fee payments subsequent to the filing of the petitions for bankruptcy.

Halbert submits that the Bankruptcy Court committed reversible error in concluding that he violated § 329(a) and Rule 2016(b) by failing to fully and accurately disclose his fee agreements or fee payments because it (1) did not accept the uncontested facts that were submitted by him as being true, (2) failed to draw all reasonable inferences in his favor, and (3) resolved the case on its substantive merits instead of determining whether genuine issues of material facts existed for trial, as required on the competing motions for a summary judgment.

**A.**

Halbert asserts that several of the findings by the Bankruptcy Court are incorrect because, in actuality, there was no misunderstanding between the parties. For instance, Halbert claims that (1) none of the parties shared the impression, which was incorrectly found by the Bankruptcy Court, that he was handling Tanners' Chapter 11 proceeding for a flat $25,000 fee, citing Tanners' Statement of Affairs and the Appellee's applications to employ him, (2) it was understood by Tanners that the $26,600 payment was a retainer, as reflected in Tanners' Statement of Affairs, and (3) the Bankruptcy Court erroneously assumed that he was attempting to conceal his bankruptcy fee agreement with Tanners because his hourly rate was disclosed in Tanners' application to employ him as counsel.

However, if Halbert's arguments are fully accepted, they would render the fiduciary obligations that are owed by a debtor's counsel pursuant to § 329(a) and Rule 2016(b) absolutely meaningless. Moreover, his comments also fail to recognize the very reason why these duties were imposed upon him. The current Bankruptcy Code and Rules were promulgated because past abuses of the bankruptcy system necessitated, among other things, bankruptcy court supervision of fee agreements and payments.

Because of the common fund nature of bankruptcy estates and, in part, due to past problems associated with attorney employment and compensation professionals performing duties for the estate are held to high fiduciary standards, and act as officers of the court.

In order to assure compliance with these duties the 1978 Bankruptcy Code implemented a system of checks and balances on employment and compensation of professionals for, previously, "the Bankruptcy system operate(d) more for the benefit of attorneys than for the benefit of creditors." Towards this end, Congress enacted standards for professional employment and compensation in the Bankruptcy Code "to guard against a recurrence of the 'sordid chapters' in the history of fees in corporate reorganizations."

*In re EWC*, 138 B.R. at 279 (citations omitted). Thus, Halbert's argument does not recognize that the current system was established for the very reason that mutually understood fee agreements between counsel and debtors had been insufficient to prevent abuses.

Compensation of debtors' counsel is closely scrutinized because of "the temptation of a failing debtor to deal too liberally with his property in employing counsel", and because transactions with debtor's attorney provide potential for "evasion of creditor protection provisions of bankruptcy laws" and "overreaching by the debtor's attorney."

*In re Whitman*, 51 B.R. at 506 (citations omitted).

There are also instances wherein debtors will not object to their attorney's fee applications because they "may be 'in no position to make an objective judgment as to the value of the legal services involved, [and ... may lack the] inclination to object to whatever fee is requested by the attorney who has made it possible ... to continue business.'" *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 843 (3d Cir.1994) (quoting *In re Hamilton Hardware Co.*, 11 B.R. 326, 329–30 (Bankr.E.D.Mich.1981)). In response to these concerns, the disclosure duties imposed upon attorneys, such as Halbert, by § 329(a) and Rule 2016(b) exist to allow the Bankruptcy Court to supervise the terms of the financial agreement between a debtor and counsel. *See In re Whitman*, 51 B.R. at 506. Consequently, evidence of a complete understanding between Halbert and Tanners regarding their financial arrangement with respect to his Chapter 11 bankruptcy legal services does not modify, relieve or excuse him from complying with the requisite disclosure duties under § 329(a) and Rule 2016(b). *See In the Matter of Arlan's Dep't Stores*, 615 F.2d at 936.

It is also insufficient that material details of the compensation agreement between Halbert and the Appellees were located in other writings submitted to the Bankruptcy Court.[23]

[The] disclosure requirements [of Rules 2014 and 2016] are not discretionary. The duty of professionals is to disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and parties in interest as well as fee arrangements....

*The bankruptcy court has neither the obligation nor the resources to investigate the truthfulness of information supplied, or to seek out conflicts of interest not disclosed.*

*In re EWC*, 138 B.R. at 280 (citations omitted) (emphasis added). "Counsel's fee revelations must be direct and comprehensive. Coy or *incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient.*" *In re Saturley*, 131 B.R. at 517 (emphasis added); *see also In re Flying E Ranch Co.*, 81 B.R. 633, 637 (Bankr.D.Colo.1988).

Thus, Halbert's failure to disclose material aspects of his fee agreement with Tanners is not remedied by (1) their mutual accord over the amount and the method by which his fees would be paid, or (2) the disclosure of this information in other documents that were submitted to the Bankruptcy Court.

### B.

The Bankruptcy Court found that Halbert violated § 329(a) and Rule 2016(b) by failing to specify that his receipt of $26,-

---

**23.** For example, Halbert argues that "[t]here is simply no chance that the [Bankruptcy] Court, or anyone reviewing the file with even a modicum of care, could be misled, or could reach the conclusion that [he] would be handling the Chapter 11 case for a flat fee." (Halbert Combined Br. at 17.)

600 from Tanners was a retainer. *In re Florence Tanners*, 209 B.R. at 443 & n. 4. Halbert submits that his disclosure was acceptable because the form, upon which the information was documented by him, (1) is substantially similar to a format that was recommended by a leading treatise, and (2) does not contain any space that would allow him to insert the retainer as an entry. However, it is too much to argue that the duties, which were imposed upon Halbert by bankruptcy statutes and rules, are superseded by unauthorized forms. Moreover, as the Bankruptcy Court indicated, a local rule makes clear that this is not the case. *In re Florence Tanners*, 209 B.R. at 442 n. 2 (citing Rule 2.03(c), Local Rules of the Bankruptcy Court (E.D.Mich.) (1990)).

■ Halbert also argues that "[t]here is no reason to require the disclosure of a retainer, because a counsel for a debtor is not authorized to be paid until the entry of a court order authorizing payment of fees, whether or not a retainer was received."[24] This argument is remarkable for its absolute failure to acknowledge the primary purpose for which the disclosure duties under bankruptcy law, including § 329(a) and Rule 2016(b), were implemented in this case. These rules and regulations have been established for the purpose of providing a bankruptcy court with sufficient statutory authority to supervise all financial agreements between a debtor and its counsel and to make certain that attorneys do not take advantage of a client's desperate circumstances by seeking unreasonable compensation amounts which could be detrimental to the bankruptcy estate. *See In re EWC*, 138 B.R. at 279; *In re Whitman*, 51 B.R. at 506. In addition, the duty to fully disclose a retainer was well-established before Halbert filed the bankruptcy petitions at issue. *See In re Futuronics*, 655 F.2d 463, 468–69; *In re Saturley*, 131 B.R. at 517.

Finally, Halbert asserts that the admonition of drawing all reasonable inferences in his favor should have precluded the Bankruptcy Court from finding that he failed to disclose the retainer in his Rule 2016(b) statement, which simply states that Tanners "paid" him $26,600. Certainly, this form of payment has the practical and legal effect of retaining an attorney and preventing his or her retention by an adversary. *Black's Law Dictionary* 1479 (4th ed.1951). In this sense, Halbert's disclosure (to wit, that he had been "paid" a certain sum of money) is consistent with an acknowledgment that a retainer had been obtained by him.

Nevertheless, the Court cannot agree with Halbert's reasoning because it ignores a key difference between retainers and other payment of professional compensation; namely, that a retainer is an unearned fee. *See In re Doors and More*, 127 B.R. at 1003. Consequently, a legitimate concern exists that (1) an attorney could demand an unconscionably high retainer amount, which has no relation to the actual services that might be reasonably rendered,[25] and (2) retainers are vulnerable to collusive agreements between counsel and a debtor to hide assets from creditors. Retainers have the potential to be detrimental to the debtor and the bankruptcy estate in a manner that is qualitatively different from earned fees.

Thus, § 329(a) requires the disclosure and explicit identification of retainers so that the Bankruptcy Court may assure that they are not excessive. *See* 11 U.S.C. § 329(b); *In re Saturley*, 131 B.R. at 514–15. In an instructive case regarding the treatment of retainers in bankruptcy, the Second Circuit concluded that the debtor's law firm violated its duties by failing to disclose that it had received a $125,000 retainer. *In the Matter of Arlan's Dep't Stores*, 615 F.2d at 934–37. The Court was concerned that the retainer

---

**24.** Halbert Combined Br. at 19.

**25.** An expression of satisfaction by the debtor's counsel in a Chapter 11 bankruptcy that the confirmation plan will provide for cash payment of his allowed compensation, 11 U.S.C. § 1129(a)(9)(A), is not necessarily sufficient to overcome this concern because at the initial stages of a case, when the retainer is requested, the counsel does not generally know whether the proceeding might be converted into one under Chapter 7. Under such circumstances, the debtor's counsel would be left to compete for his (or her) fees with other officers of the estate who also have first priority in the eventual distribution of the estate pursuant to 11 U.S.C. § 507(a)(1).

was "grossly disproportionate" to the $5,000 maximum fee which would have been charged to the debtor for the law firm's pre-petition services. *Id.* at 936. It also looked with disfavor upon this arrangement because the debtor's financial condition was such that it was compelled to "siphon" the retainer amount from its cash receipts, which resulted in a debtor's representative "lugg[ing] a satchel containing $124,933.98 in cash" to the attorney's office on the eve of the Chapter 11 filing, where a law partner "counted out five, ten and twenty dollar bills and apparently quarters, dimes, nickels and pennies as well." *Id.* at 935, 936. Particularly troubling about this method of financing was that the debtor realized that it lacked the necessary cash with which to purchase merchandise for its insufficiently stocked stores, a situation that brought about the sale of 26 of its 73 stores to raise money. *Id.* at 936. Reviewing these facts, the Court wrote:

> the prospective client was about to embark upon a bankruptcy proceeding in which its attorneys fees unquestionably were subject to judicial review and scrutiny. It was not a venture involving simply attorney and client, but one in which the creditors of the bankrupt and the court had an undeniable interest.... We are not insensitive to the financial drain imposed upon a law firm which is about to undertake the arduous and complicated tasks here envisaged no matter how promising the prospects that the Chapter XI proceedings will eventually succeed. *Again the question is not merely the sum taken but whether it should have been disclosed. The law firm is not expected to disregard its own welfare, but neither is it expected to ignore its obligation to advise the court so that the court might make the determination of propriety based on the circumstances in the case.* The arguments made to support the receipt of the retainer should have been raised at the outset and not six months after the event.

*Id.* at 936 (citation omitted) (emphasis added).

Although no similarly grave situation occurred in the Tanners' case, the point is that justifiable reasons exist for requiring not only the disclosure, but also the separate and specific identification of, retainer amounts received by a debtor's counsel. This duty should have been a familiar one to Halbert because compliance with § 329 and Rule 2016 requires disclosure of " 'the precise nature of the fee arrangement.' " *In re Park–Helena Corp.,* 63 F.3d 877, 881 (9th Cir.1995) (quoting *In re Glenn Elec. Sales,* 99 B.R. at 600), *cert. denied,* 516 U.S. 1049, 116 S.Ct. 712, 133 L.Ed.2d 667 (1996). Thus, in *In re Park–Helena,* a law firm disclosed its receipt of a $150,000 retainer, but misidentified the source of its payment. The Bankruptcy Court concluded that the law firm violated § 329 and Rule 2016 because it failed to comply with its duty to disclose "the facts of the transaction, as those facts were known to the firm." *In re Park–Helena,* 63 F.3d at 881. Similar reasoning supports the conclusion by the Bankruptcy Court that Halbert did not satisfy his disclosure obligation because he failed to specify that the payment was a retainer.

Under these circumstances, the Bankruptcy Court was not required to conclude that Halbert had sufficiently disclosed the retainer by saying he had been "paid" a certain amount of money. Arguably, Halbert's argument may have been meritorious if the decision by the Bankruptcy Court on this issue was governed by a factual finding. But it was not. Instead, it was determined by a legal conclusion that the Bankruptcy Court was entitled to make even on summary judgment. Having concluded that § 329(a) and Rule 2016(b) required the separate and distinct identification of retainer amounts received, the Bankruptcy Court correctly ruled that Halbert violated this duty because there was no genuine issue of a material fact regarding his disclosure.

### C.

Halbert claims that the Bankruptcy Court impermissibly drew inferences against him when it concluded that he gave the "impression" that his receipt of $25,000 was a flat fee for Tanners' bankruptcy. *In re Florence Tanners,* 209 B.R. at 442–43. His first argument (namely, that the conclusion by the Bankruptcy Court constitutes an incorrect

finding of fact because neither he nor his clients shared this impression) has been addressed in subpart A of this section.

His second argument asserts that it is common knowledge that Chapter 11 bankruptcies are handled on an hourly fee basis in this district. Consequently, he submits that "[i]n drawing an 'inference' without evidence, certainly where the interest is adverse to a respondent to a motion for summary judgment, the Court must at a minimum have an obligation to take notice of the practices of which it is aware."[26] He cites no authority for this proposition other than *In re Beesley,* 212 B.R. 4 (Bankr.D.Me.1997). Although that court did take notice of what, in its experience, was the prevailing bankruptcy fee arrangement, *id.* at 7, the case cannot fairly be construed to *require* that courts take judicial notice of such matters. Whether a court is mandated to take judicial notice is governed by Fed.R.Evid. 201, which is applicable in bankruptcy proceedings. Fed.R.Evid. 101. Under Rule 201, judicial notice is mandatory only "if requested by a party and [the court] is supplied with the necessary information." Fed.R.Evid. 201(d). At no point in Halbert's pleadings does he allege that he requested the Bankruptcy Court to take judicial notice of the prevailing Chapter 11 fee agreements in this District. Moreover, judicial notice is limited to those adjudicative facts that are "generally known within the territorial jurisdiction of the trial court."[27] Fed.R.Evid. 201(a), (b)(1). The type of fee arrangement that might generally apply to Chapter 11 cases in this District does not meet this standard because "[t]he test of judicially noticed facts under 201(b)(1) is the entire community, not some specialized group" such as "judges and lawyers." 21 Wright & Graham, Federal Practice and Procedure: Evidence § 5105 at 495 (1977).

Perhaps most importantly, Halbert cannot deny that his statement that $25,000 was paid or agreed to be paid by Tanners for services in contemplation of, or in connection with, the bankruptcy fails to fully and accurately disclose the hourly fee agreement that he acknowledges existed. Thus, the Bankruptcy Court, faced with the uncontested content of Halbert's disclosure, was correct to take that statement at face value and conclude that he had violated his duty to disclose.

## D.

Halbert also contests the determination by the Bankruptcy Court that he failed to disclose an hourly fee arrangement with the Appellees which was agreed upon by the parties within one year of the bankruptcy filing. *In re Florence Tanners,* 209 B.R. at 443. He is correct, in that the Bankruptcy Court exceeded its bounds in finding that an hourly fee agreement existed.

In its ruling, the Bankruptcy Court determined that the agreement existed among the parties when it referred to a December 5, 1994 billing from Halbert which was considered along with certain portions of an affidavit that he submitted in support of his motion for a summary judgment. *Id.* From these sources, the Court correctly noted that (1) the billing was for legal services from January 27, 1994 through December 3, 1994, (2) discussions regarding a Chapter 11 filing for Tanners first occurred on April 21, 1994, and (3) further discussions in contemplation of bankruptcy did not take place until the actual filing of the petition. *Id.* The Court, after noting that "[c]learly, there was an agreement that Tanners would pay for those services, but Halbert did not disclose such an agreement," concluded that Halbert's failure to disclose this agreement violated his disclosure duties under § 329(a) and Rule 2016(b). *Id.*

Although it is undoubtedly plausible to deduce that a fee agreement existed between Halbert and Tanners for these services in contemplation of bankruptcy, there is no direct information relating to any such agreement in any of the material upon which the Bankruptcy Court relied. Thus, there is no

---

26. Halbert Combined Br. at 17–18.

27. The alternate standard for taking judicial notice (to wit, a fact must be "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"), Fed.R.Evid. 201(b)(2), does not appear to be applicable here.

extrinsic evidence from which the Bankruptcy Court could have found that this agreement existed, the method of payment, or the date on which it was mutually accepted by, and binding upon, the parties. Consequently, the applicable standards of review for the Appellees' dispositive motion preclude the Bankruptcy Court from having found sufficient material facts from which the existence and terms of the parties' agreement could be determined.

Strict compliance with the directive to draw all reasonable inferences in favor of Halbert should have resulted in the Bankruptcy Court making no finding about such an agreement. Apart from whether this directive required the assumption that Halbert agreed to work on the bankruptcy pro bono, about which this Court expresses no opinion, the Bankruptcy Court improperly assumed that any such agreement fell within the bounds of § 329(a) and Rule 2016(b). This conclusion was reached even though Halbert presented uncontested extrinsic evidence which indicated that his only fee agreement with Tanners was achieved on September 1, 1993, more than one year before its petition was filed.[28] Indeed, Halbert contends on appeal that this fee agreement, which provided for an hourly fee of $165, is the only one relating to the bankruptcy, a claim which is undisputed by the Appellees.[29]

While the Court expresses no opinion as to whether Halbert was under a duty to disclose this fee agreement, it is apparent that the Bankruptcy Court drew inferences against him based on an incomplete understanding of the facts and the parties' positions on this issue. The Bankruptcy Court also failed to set forth on the record the basis for this alleged violation while at the same time being unable to establish the date on which the alleged agreement was entered. *Cf. In the Matter of Prudhomme*, 43 F.3d 1000, 1002–03 (5th Cir.1995) (court can order disgorgement of fee paid more than one year before filing of petition because one year limitation period in § 329(a) is rebuttable presumption that any compensation paid before pre-petition year period is not in contemplation of bankruptcy and consequently § 329(a) does "not provide a limitations period beyond which the court cannot reach.") Therefore, the findings and conclusions of the Bankruptcy Court on this issue must be vacated.

### E.

Halbert also contests another decision of the Bankruptcy Court which held that the failure to report his receipt of the merchandise from Tanners on November 19, 1994 constituted a violation of his fiduciary duties because it represented a payment in contemplation of bankruptcy and made within one year preceding the filing of the petition. *In re Florence Tanners*, 209 B.R. at 443–44.

While at least one of Halbert's arguments (e.g., he had the legal right to apply the payments received from Tanners to any invoice, time entry or future unearned professional fees) appear to raise questionable ethical behavior, the Bankruptcy Court gives no indication of having evaluated his argument that the November 19, 1994 merchandise transfer, as well as other merchandise deliveries, could be applied exclusively to non-bankruptcy related services that were provided before the petitions were filed.[30] Moreover, the Bankruptcy Court does not appear to have addressed Tanners' argument that all of the merchandise transfers to Halbert were in payment of pre–1994 fee obligations.

As a consequence, it appears that the Bankruptcy Court did not evaluate this issue in a light most favorable to Halbert. Hence, its findings and conclusions with regard to this matter must be vacated.

### F.

The Bankruptcy Court held that Halbert violated his disclosure duties under Rule 2016(b) by not revealing the receipt of six post-confirmation fees from Tanners, totaling

---

**28.** R. 12, Exs. 2, 4 at ¶ 5.

**29.** The Appellees' applications for authority to appoint Halbert as their counsel confirms that he was charging his clients at the rate of $165 per hour. *In re Florence Tanners*, 209 B.R. at 443 n. 3.

**30.** Halbert made this argument to the Bankruptcy Court in his reply brief. (R. 15 at 8 & Ex. A.)

$51,868.92.[31] Halbert, in vociferously asserting that no source of bankruptcy law imposes a duty upon an attorney to disclose his receipt of post-confirmation fees from a debtor, maintains that the interpretation of Rule 2016(b) by the Bankruptcy Court is impermissibly broad and creates an absurd result.

Notwithstanding the positions that have been advanced, the record on this issue is insufficient and, thus, it precludes any meaningful judicial review of the contested issue. In fact, the only case which has been cited by the Bankruptcy Court in support of its conclusion that Rule 2016(b) applies to post-confirmation proceedings is *In re John G. Berg Assocs., Inc.*, 138 B.R. 782, 787 (Bankr. E.D.Pa.1992). However, it is not clear to this Court that *Berg* controls the issue in controversy because it concerns fees sought in an adversary proceeding that was initiated during a post-confirmation period by an attorney who had neither made a pre-confirmation appearance nor filed a disclosure statement. Moreover, *Berg* reached its holding in part by rejecting an argument that disclosures are no longer mandated after confirmation because 11 U.S.C. § 1141(b) revests all the bankruptcy estate's property in the debtor.[32] *Id.* at 784. This conclusion may run counter to that of another case, in which it was held that "[s]ince the law vests property in the debtor following confirmation, the court cannot have a supervisory role in the execution of a Chapter 11 plan or in the payment of a debtor's post-confirmation debts." *In re Barker Med. Co.*, 55 B.R. 435, 437 (Bankr.M.D.Ala.1985).

In addition, the Bankruptcy Court did not address a factor which the *Berg* court found controlling; to wit, that the "power [of the bankruptcy court] over fee applications must be related to the issue of its subject-matter jurisdiction to hear the post-confirmation matters in furtherance of which services were rendered" because "[a] bankruptcy is not 'forever;' after confirmation, a debtor must normally 'go about its business without further supervision or approval' from the bankruptcy court." *Berg*, 138 B.R. at 786 (citations omitted). The implementation of this standard may depend on whether the confirmation plan retains jurisdiction over the compensation to those professional persons who rendered bankruptcy services. *See* 11 U.S.C. § 1141(b); *In re Powers*, 93 B.R. 513, 516–17 (Bankr.S.D.Tex.1988).[33]

For these reasons, the findings and conclusions of the Bankruptcy Court on this issue are vacated.

## V.

■ Before examining the propriety of the sanctions imposed by the Bankruptcy Court upon Halbert, the Court notes that most of his challenges relate to conclusions by the Bankruptcy Court that he violated several prescribed statutory rules which required him to make a full and complete disclosure of his financial relationship with the Appellees. However, one other challenged conclusion by the Bankruptcy Court pertains to his appointment to represent the Appellees in violation of § 327(a), which can be characterized as a violation of disinterestedness rules that are imposed upon a debtor's counsel by bankruptcy law.[34] Violations of

---

**31.** This holding actually extended to ten fee payments that Halbert received. *In re Florence Tanners*, 209 B.R. at 444. Four of those were his pre-confirmation withdrawals from the retainer. Halbert does not contest the ruling by the Bankruptcy Court that his failure to file a supplemental disclosure statement concerning these four payments violated Rule 2016(b). Thus, the discussion here is reserved to the remaining six payments, all of which Halbert received post-confirmation.

**32.** Halbert makes the same argument in the case at bar.

**33.** As suggested above and confirmed by the *Berg* court, "this is a confusing area [of the law]."

*Berg*, 138 B.R. at 784. Consequently, this Court would benefit from a more detailed discussion by the Bankruptcy Court on this issue. The duty to disclose may be dependent on whether the debt, for which the payment is rendered, was incurred before or after confirmation. *See In re Barker Med.*, 55 B.R. at 436–37. If so, the Bankruptcy Court should explain this limiting factor.

**34.** Bankruptcy cases reviewed by this Court appear to interchangeably use the terms "disinterestedness" and "conflict of interest." As a consequence, this Court will treat these two terms as being equivalent.

the disclosure and disinterestedness rules are independent of each other, although the remedies for each are similar. *See In re EWC*, 138 B.R. at 281.

▮ Three possible consequences have been identified for disinterestedness violations: (1) the discretionary setting aside of a professional's employment pursuant to § 327(a),[35] (2) the mandatory setting aside of the § 327(a) employment and denial of compensation for services performed during the period of the conflict pursuant to 330(a),[36] or (3) the discretionary denial of all or part of the compensation requested pursuant to 1 U.S.C. § 328(c).[37] *In re EWC*, 138 B.R. at 281–82. It became clear one month after Halbert filed the bankruptcy petitions at issue here, if not before, that this Circuit follows the second approach.[38] *In re Federated*, 44 F.3d at 1320. This position is consistent with a decision by the Supreme Court, in which it was determined that the only way to assure the maintenance of the requisite standards of fiduciary conduct by professionals is to give strict enforcement to their compliance with the conflict of interest rules by denying compensation to them, even if the estate has suffered no harm, because the employment of such a standard will have the effect of deterring any future violations. *See Woods v. City Nat'l Bank & Trust Co. of Chicago*, 312 U.S. 262, 268–69, 61 S.Ct. 493, 85 L.Ed. 820 (1941).

▮ By contrast, a violation of the bankruptcy disclosure rules can be sanctioned by denying a counsel's requested compensation, as well as through an order of disgorgement of fees that have already been received. *In re EWC*, 138 B.R. at 280–81; *In re Whitman*, 51 B.R. at 506–07. "Violation of the disclosure rules alone is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connections or fee arrangements were materially adverse to the interests of the estate or

were de minimis." *In re EWC*, 138 B.R. at 280.

▮ In the case at hand, the Bankruptcy Court sanctioned Halbert by denying his requested compensation. *In re Florence Tanners*, 213 B.R. at 132. As suggested by the preceding discussion in this section, the Bankruptcy Court had ample authority to impose such a sanction in Tanners' case even though it was based on a fewer number of violations than this Court has found. *See also In re Lewis*, 113 F.3d at 1044–46; *In re Downs*, 103 F.3d at 477–78; *In re Park–Helena*, 63 F.3d at 882; *In the Matter of Prudhomme*, 43 F.3d at 1003; *In re American Thrift*, 137 B.R. at 390; *In re EWC*, 138 B.R. at 280–81. Bankruptcy courts have a great deal of latitude in imposing appropriate sanctions, and such sanctions will not be disturbed absent a clear abuse of discretion. *In re Downs*, 103 F.3d at 478. There is no evidence in this record that the Bankruptcy Court abused its discretion in denying Halbert's fee application in Tanners' case. Hence, this sanction is affirmed.

In large measure, Halbert's argument on appeal appears to be based on his perception of the harshness of the various decisions by the Bankruptcy Court, especially inasmuch as he did not purposefully violate his disclosure duties or willfully withhold information from the Bankruptcy Court. This position relies on the doctrine that the severity of an attorney's conduct and the excessiveness or reasonableness of the fees charged should be considered by a reviewing court when assessing sanctions, a power which must be exercised "with restraint and discretion." *See In re Lewis*, 113 F.3d at 1045; *In re Downs*, 103 F.3d at 478.

▮ However, a debtor's counsel who is appointed under the Bankruptcy Code can lay no claim of right to a lesser sanction than a bankruptcy court is authorized to impose for a disinterestedness or disclosure violation. This is especially true in those situations in which there has been a clear failure

---

**35.** *See, e.g., In the Matter of PHM Credit Corp.*, 99 B.R. 762, 766 (E.D.Mich.1989).

**36.** *See, e.g., In re Gray*, 64 B.R. at 507–08.

**37.** *See, e.g., In re Micro–Time Management Sys., Inc.*, 102 B.R. 602, 605–06 (Bankr.E.D.Mich. 1989).

**38.** *See supra* note 22 and accompanying text.

to make a timely, complete, and spontaneous disclosure regarding facts that are material to disqualification issues, even in the absence of actual harm and, and as in the case at bar, when it is conceded that the attorney provided valuable services. *See Rome,* 19 F.3d at 62; *In the Matter of Futuronics,* 655 F.2d at 471. In addition, a complete denial of compensation can be ordered even if the disclosure violations innocently resulted from neglect, oversight, or lack of familiarity with bankruptcy requirements. *See In re Park–Helena,* 63 F.3d at 881, 882; *In the Matter of Arlan's Dep't Stores,* 615 F.2d at 939, 941–44; *In re Meyer,* 50 B.R. 3, 4 (Bankr.S.D.Fla. 1985). "[F]ailure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule." *In re Park–Helena,* 63 F.3d at 880.

Moreover, it is not unusual for bankruptcy attorneys who represent debtors to be denied the compensation for their services if they have failed to satisfy their disclosure duties. Such cases were prevalent well before Halbert filed the instant petitions in December 1994. For example, in one case an attorney failed to disclose approximately half of the compensation that he had received from the debtors prior to the hearing on his fee application. *In re Meyer,* 50 B.R. at 4. This led the court to deny all of the fees that he had requested. *Id.* In another decision, various failures to disclose conflicts of interest, including lack of notice to the Bankruptcy Court regarding potentially preferential transfers and payments received in the year preceding the bankruptcy filing, resulted in a denial of all fees. *In re American Thrift,* 137 B.R. at 388–91 (allowing reimbursement only of reasonable expenses). Similarly, a different court denied the compensation requested and ordered the disgorgement of the reimbursements that had been taken from a retainer by an attorney whose fee application (1) did not specify the full amount of the retainer, (2) omitted some work that had been performed by him and the fees that were received prior to the filing of the peti-

tion for bankruptcy, and (3) did not contain a Rule 2016(b) statement. *In re Saturley,* 131 B.R. at 516–17, 522; *see also In the Matter of Futuronics,* 655 F.2d at 466, 468–71; *In the Matter of Arlan's Dep't Stores,* 615 F.2d at 929–38; *In re Whitman,* 51 B.R. at 507.

Although an argument may be made about the distinctions that may exist between his circumstances and those found in the cases which were relied upon by this Court and the Bankruptcy Court,

> "[L]ittle profit will come from a dissection of the precedents.... What is similar in many, or so its seems to us, is the animating principle." The animating principle here is the fiduciary obligation owed by counsel for the debtor to the bankruptcy court.

*In the Matter of Arlan's Dep't Stores,* 615 F.2d at 937 (citation omitted).

## VI.

Having found that the Bankruptcy Court's denial of Halbert's fee application in the Tanners' case was fully warranted, there remain several arguments by Halbert that require attention.

### A.

■ Halbert submits that this Court should enter a summary judgment in his favor and against the Yousifs because the Bankruptcy Court did not cite any law and found no facts upon which to support its denial of his request for attorney fees relating to services rendered in the Yousifs' bankruptcy. This Court agrees. All of his deficiencies, which were the subject of the two opinions by the Bankruptcy Court, relate to his conduct in the Tanners bankruptcy proceeding. In fact, there is no discussion or evaluation of Halbert's compliance or noncompliance with his disclosure and disinterestedness duties in the Yousif case.[39]

Therefore, the entry of a summary judgment by the Bankruptcy Court in favor of the Yousifs is vacated. Further, the issue of whether a summary judgment should be en-

---

**39.** Although the Bankruptcy Court did recite the Rule 2016(b) disclosures made by Halbert in the Yousif case, *In re Florence Tanners,* 209 B.R. at 442, it did not make any factual findings or legal conclusions that are pertinent to those disclosures.

tered on Halbert's application for fees in the Yousifs' case is remanded for further consideration by the Bankruptcy Court.

### B.

██ Halbert argues that the Bankruptcy Court denied his fee applications for reasons raised for the first time in its opinions, in violation of his right to respond and to due process, as guaranteed by the United States Constitution. In his judgment, the Bankruptcy Court went far beyond any of the issues that were raised by the Appellees in their objections to his fee application.[40] In support of this argument, Halbert cites *In re Busy Beaver* for its discussion regarding the procedures to be followed by a bankruptcy court in reviewing fee applications. That case held that 11 U.S.C. §§ 329(b) and 330(a), Fed. R. Bankr.P.2017(b), "and perhaps even the dictates of due process" under the Fifth Amendment of the Constitution, require that a "good faith" fee applicant be informed of particular concerns regarding the application and allowed a meaningful opportunity to respond with evidence or argument. *In re Busy Beaver*, 19 F.3d at 845–47.

However, *In re Busy Beaver* is inapposite to the case at bar, in that it is limited to those situations in which only the bankruptcy court raises objections to a fee application. *Id.* at 838, 840–45. As the Court explained, its ruling was in large part premised on the absence of an adversary proceeding, as a result of which the fee applicant would have no basis to know of the concerns at issue unless it was informed of them by the reviewing court in advance of the hearing. *See id.* at 842, 845–47 & n. 16. Thus, *In re Busy Beaver* does not represent an extension of a litigant's due process rights when a bankruptcy fee application is being reviewed in what is essentially an adversary process after a debtor's objections are filed.

At most, the case should be construed as being consistent with generally understood principles of due process and fair play, standing only for the proposition that a litigant has a right to meaningful input into the decision-making process by the court when rights or benefits attendant to the litigant are at issue. Here, Halbert was given such an opportunity in the Bankruptcy Court below where objections to his fee applications were raised by the debtors—not the court—and a classic adversarial process ensued which resulted in Halbert making numerous arguments and producing an extensive amount of extrinsic evidence in support of his position. The circumstances in this controversy do not parallel the facts in the other cases in which violations of due process were found. *Cf. In re Yellow Cab Coop.*, 185 B.R. at 848–49, 852 (granting of receiver's pre-petition fee requests violated due process where (1) approval procedure was "unseemly streamlined, almost invisible, and encased in mystery" and "on automatic pilot," (2) debtor and other interested parties were effectively given no notice or opportunity to object or otherwise be heard on issue of fees, and (3) debtor's board of directors was threatened with contempt if it attempted to participate).

Halbert has produced no authority which suggests that the Bankruptcy Court was circumscribed in its ruling by the parties' arguments. In the absence of any controlling authority in support of this position, the Court will not adopt any such doctrine. Halbert was fully aware that the validity of his fee applications was at issue. Moreover, the objections by the Appellees, to which Halbert was given notice and an opportunity to respond, adequately brought into issue all the disclosure and disinterestedness matters that the Bankruptcy Court addressed in its opinions.

### C.

Halbert argues that the failure of Tanners to provide the Court with sufficient extrinsic

---

40. In their objections to the application for attorney fees, the Yousifs and Tanners contended that (1) Halbert was not a disinterested participant in these proceedings because he was a creditor, a debtor or a preference recipient, (2) his fees during and after the Chapter 11 proceedings were excessive and unreasonable, (3) he engaged in unethical conduct or conduct which created

an appearance of impropriety during their bankruptcy proceedings, and (4) the retainer, and retained amounts that were recovered through settlements of two adversary post-confirmation preference proceedings, were withdrawn by him without prior court approval. Subsequent to filing their objections, the Appellees abandoned their allegation that Halbert was a creditor.

evidence with which to counter the allegations within his motion for summary judgment entitles him to obtain a favorable decision on his application for attorney fees. It is true that Tanners provided a paucity of extrinsic evidence, especially when compared with the amount of Halbert's documentation that accompanied his dispositive motion. In fact, it pales by comparison. But the quantity of evidence does not assure victory, and certainly not in the absence of merit. The Bankruptcy Court had the obligation to base its legal rulings on the undisputed facts before it, and with the exceptions noted in this Order its holdings are fully supported by the record. It is simply immaterial that Halbert supplied much of the evidence upon which adverse conclusions to him were based.

### D.

Halbert complains that the statements by the Bankruptcy Court which described his disclosures as "false, misleading, and incomplete," and asserted that he had "systematically violated" his disclosure obligations, *In re Florence Tanners*, 209 B.R. at 442, 444, are unsupported by the record or by the unfounded findings of fact. But the language, about which he complains, is dicta, and will not be addressed on appeal beyond a review by this Court of the specific factual issues upon which the Bankruptcy Court drew its conclusions of law. Although Halbert may feel that his "professional honor has been impugned by the court below," "[l]awyers ... must be in the first instance the guardians of their own reputations. Any blots on their escutcheons are self-inflicted, not court-created." *In the Matter of Arlan's Dep't Stores*, 615 F.2d at 944.

### VII.

Accordingly, for the reasons that have been set forth above, the granting of the Appellees' summary judgment motion, and the denial of a similar request by Halbert, is affirmed in part, vacated in part, and remanded. The denial by the Bankruptcy Court of Halbert's fee application in the Tanners' bankruptcy case is affirmed, although certain findings of fact and conclusions of law upon which the holding by the Bankruptcy

Court was based are vacated and remanded to the Bankruptcy Court. The denial by the Bankruptcy Court of Halbert's fee application in the Yousifs' bankruptcy case is vacated and remanded.

IT IS SO ORDERED.